# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| United States,<br><br>           Plaintiff,<br><br>v.<br><br>Juan Valencia-Aguilar,<br><br>           Defendant. | No. CR 07-1172-TUC-RCC(JM)<br><br>**REPORT AND RECOMMENDATION** |

Pursuant to Minute Entry Order dated May 30, 2007, this matter was referred to Magistrate Judge Jacqueline Marshall for all pretrial matters. On August 15, 2007, Defendant Juan Valencia-Aguilar ("Defendant") filed a Motion to Suppress Post-Arrest Statement (Docket No. 19). The Motion to Suppress was heard by Magistrate Judge Marshall on September 7, 2007. Defendant was present and represented by counsel. One witness was presented by the Government, DEA Special Agent Luis Mendez ("Agent Mendez"). Defendant called the Government's case agent, DEA Special Agent Todd Smith ("Agent Smith") to testify. The Defendant also testified on his own behalf. On rebuttal, the Government recalled Agent Smith to testify. The witnesses were examined and cross-examined. Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that the District Court deny Defendant's Motion to Suppress Post-Arrest Statement.[1]

---

[1] Trial in this matter is scheduled for October 23, 2007.

## I.   **FINDINGS OF FACT**

On May 24, 2007, approximately 25 agents, who were working under Agent Smith, were assigned to conduct surveillance of a suspected cocaine transaction that agents had arranged based on information supplied by an FBI informant. (Tr. 46-48).[2] During the operation, Defendant was arrested while inside a Wal-Mart store and was transported to the DEA office in Tucson, Arizona. (Tr. 58-59). Agent Smith selected Agent Mendez to conduct interviews of the arrested individuals, including this Defendant. (Tr. 55). FBI Special Agent Rubalcava ("Agent Rubalcava") was also present during the interview. (Tr. 15).

After Defendant's arrest, and after spending a short time in a holding cell, Defendant was brought into the booking area, photographed, fingerprinted and asked some biographical data. (Tr. 14 & 59). Defendant advised agents that he was a civil engineer. (Tr. 14 & 63.) He was then taken into the interview room. (Tr. 15.) Defendant was not handcuffed or otherwise restrained. (*Id*.) Agent Rubalcava was unarmed and Agent Mendez was armed, but the weapon was in his ankle holster and not visible to anyone. (Tr. 16.)

Agent Mendez testified that he had been employed with DEA for 14 years, had been trained to issue *Miranda* warnings and had in fact issued *Miranda* warnings during that time (Tr. 11-12). During his 14 years as a federal agent, Agent Mendez conducted over a hundred interviews and developed a protocol or a pattern as to how he conducted them. (Tr. 16 & 29.) He would come into the interview room, ask the defendant if spoke English or not, identify himself, fill out another processing form, inform the defendant what he was arrested for, read him his *Miranda* rights using the waiver forms if he had them with him and then continue with questioning. (TR. 17.)

---

[2]The transcript of the September 7, 2007, proceedings is designated "Tr." followed by the page number where the cited testimony appears; line numbers are included when quoting from the record.

1    In the present case, Agent Mendez testified that he followed his routine procedure. (Tr. 17-19.) He first asked Defendant if he spoke English; Defendant said he only spoke Spanish. (Tr. 18.) After learning that Defendant spoke only Spanish, the discussion and interview was conducted in the Spanish language. (*Id.*) When questioned about his Spanish speaking skills, Agent Mendez testified that he was raised learning both Spanish and English since his early childhood, since he was born; thus he was raised in a bilingual home. (Tr. 18.)

After both Agents Mendez and Rubalcava identified themselves and showed Defendant their badges (Tr. 17 & 65), Agent Mendez confirmed Defendant's booking information and informed him that he was arrested for conspiracy to possess and distribute cocaine. (Tr. 18-19, 26-27 & 63). Using the waiver form he had with him that day, Agent Mendez read Defendant his *Miranda* warnings in Spanish from official DEA Form 13A. (*Id.*) He also provided the form to Defendant to read. (Tr. 26.) According to Agent Mendez, Defendant appeared to be reading the form. (Tr. 20). He did not ask any questions. (*Id.*) Defendant signed the form. (Tr. 21). As translated, the form states:

Form of the Statement of *Waiver* of Rights

You have the right to *remain* silent.
Anything that you say can be used against you in court.
You have the right to consult with an attorney before *asking* you *some* questions and to have said attorney present during the questioning.
If you cannot pay for the services of an attorney, one will be named for you before any questioning if you so desire.

Do you understand? Yes___ No___

Are you willing to answer some questions? Yes___ No___

I understand the statements of rights _____ Day _____ Time _____
_____

Statement of (your name) _____ were made in the office of DEA in Tucson on _____(date) at _____(time)

for Special Agent_____ referring _____(what they *obtained* of information or drugs or about who)

Government's Exhibit 1, Tr. 72 (italics added).

The interpreter noted that each of the words in shown in italics in the translation were misspelled. Specifically, the Spanish word for "waiver" was misspelled, but to his knowledge, the misspelled word did not have another meaning in Spanish. (Tr. 71.) The Spanish words for "remain," "asking," "some" and "obtained" were also misspelled. (Tr. 72).

After he had read the form to Defendant and had allowed him time to read it, Agent Mendez asked Defendant in Spanish if he understood the *Miranda* warnings . (Tr. 23). After Defendant verbally stated that he understood his rights, Agent Mendez stated to him, "if [you] understood [your] rights...mark where the line right next to where it says yes [on the form]." (Tr. 23:24-25.) Defendant marked the form acknowledging that he understood his rights. (Tr. 24). Agent Mendez then asked Defendant if he was willing to forego those rights and answer questions to which Defendant verbally stated that he was willing to answer questions. (Tr. 24.) Defendant also marked the "yes" on the form following that question. (*Id.*) After Defendant signed and dated the form (Tr. 24-25), Agent Mendez began his questioning. (Tr. 27).

When asked why Defendant's 45 minute interview was not recorded, Agent Mendez testified that he did not even consider or think about taping the interview. (Tr. 31.) The case was not his and he was not involved in designing the actual enforcement action. (*Id.*) When asked what DEA's policy was with respect to taping statements, Agent Mendez stated that DEA is not required to record statements. (Tr. 29-30.) It's within "[t]he agent's discretion. If there's a situation where there's an interview where an agent produces a statement and the defendant is not literally skilled to read or write a complaint himself or a statement, then it's recommended that we do the recordings." (Tr. 30:6-10.) An agent will try to record a statement if a defendant asks to have his interview recorded and will record statements if directed by a prosecutor to do so. (Tr. 30.) When working with local law enforcement agencies and participating in their interviews, Agent Mendez stated that he will record statements if that specific agency has a policy of doing so. (Tr. 30-31.) In this particular

1 case, the Defendant did not request that his statement be recorded and Agent Mendez did not
2 receive any direction whether or not he should or should not record the interview. (Tr. 30.)

3       A tape recording would indeed have been very helpful in this case as Defendant's
4 testimony about the circumstances of his interrogation differed significantly from that of
5 Agent Mendez. With respect to the advisement of rights portion of the form, the Defendant
6 testified that he was *not* told that he had the right to speak to an attorney before answering
7 questions. (Tr. 74.) He *first* learned of his right to counsel when he spoke to his attorney in
8 prison, presumably after his interrogation in the present case. (Tr. 60.) During cross-
9 examination, the Defendant admitted that he was told by the agents to read the paper, he had
10 the ability to read the form, and knew how to spell in Spanish (Tr. 67 & 68) yet he did not
11 read the form (Tr. 73). After lengthy cross-examination by the Government, the Defendant
12 admitted that he did not read the form "because they'd already told me." (*Id.*) Defendant also
13 testified that while the Agents did ask him if he understood what they had said, he did not
14 actually tell them that he understood. (Tr. 79.)

15       With respect to the waiver of rights portion of the form, Defendant testified that the
16 agents just told him to sign the paper. (Tr. 60.) When asked by the Court to clarify what he
17 meant, Defendant stated that the agents did not just hand him the form and tell him to sign
18 where he wanted to sign it. (Tr. 80.) Instead, the agents handed him the form and
19 specifically told him to make a sign where the form read "yes." (*Id.*)

20       For impeachment purposes, Agent Smith was called to testify about Defendant's post-
21 arrest statement as compared to the intelligence gathered by law enforcement. (Tr. 97.) The
22 first inconsistency concerned the vehicle driven to the purported stash house. (Tr. 87 & 99.).
23 According to the statement provided by Defendant, he traveled to the Mossman house alone
24 in his own car, a red Ford Explorer. (*Id.*) According to government surveillance videos,
25 Defendant was one of two occupants in a minivan that traveled from the Wal-Mart to the
26 Mossman house. (*Id.*) Presumably the inconsistency is important since the minivan was
27 going to the Mossman house to be loaded with cocaine. (*Id.*) On cross-examination, defense
28

5

1  counsel established that when Defendant left the Wal-Mart "after the business with the
2  minivan [after it had been allegedly loaded with drugs at the Mossman house and returned
3  to the Wal-Mart]" (Tr. 99:15), Defendant did in fact leave alone in his red Ford Explorer.
4  The implication made by counsel was that Defendant was not lying, he was just referring to
5  the *second* time he left Wal-mart.  (Tr. 99.)

6        Another inconsistency raised by Agent Smith concerned where the minivan parked
7  at the Mossman house and the manner of ingress by Defendant and his co-defendant into the
8  Mossman residence or garage.  (Tr. 97.)  According to Defendant's statement, the minivan
9  parked in the driveway near the garage and they walked to a door next to the garage.  (Tr.
10 90.)  According to the surveillance tapes, when the minivan arrived at the Mossman house,
11 the van pulled into the garage and the garage door closed.  (Tr. 87-88.)  On cross-
12 examination, Agent Smith admitted that all he could tell from Defendant's statement (as
13 memorialized by the interviewing officers) was that the minivan parked in the driveway and
14 its occupants entered through an external door; it could have been the garage door access into
15 the house itself or a door leading into the garage.  (Tr. 98.)

16       The third and more relevant inconsistency concerned Defendant's statement regarding
17 ownership of the purported stash house.  When questioned about the Mossman home,
18 Defendant said that his co-defendant had a key to the house but he did not know how he got
19 it.  (Tr. 102 & Government's Exhibit 2.)  Additionally, when asked who the owner of the
20 house was, Defendant said it was owned by "Jackie."  (Tr. 91.)  Agent Smith testified that
21 according to their investigation, title to the Mossman home is legally in the name of someone
22 else, but it is actually owned and paid for by Defendant, known as "Tico," and his brother.
23 (Tr. 95.)  According to Agent Smith, the titled owners of the house do not even have keys
24 to the property.  (Tr. 96.)  When "Tico asked [Jackie] if he wanted keys," he stated that they
25 did not (Tr. 96:24-25), referring to he and his wife (Tr. 93); "they were uncomfortable about
26 the property transfer."  (Tr. 96:20.)

27 . . . .

28

6

## II. **CONCLUSIONS OF LAW**

### A. **Defendant was informed of his *Miranda* rights.**

"A person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

Here, Agent Mendez testified that he read Defendant his rights in Spanish from DEA From 13A. Agent Mendez also testified that he then provided the form to Defendant to read and that it appeared that Defendant actually did so. While Defendant initially testified that he was not told that he had the right to speak to an attorney, he did admit on cross-examination that he did not read the form because the Agents had already informed him of his rights. Considering the testimony together, the Court finds that, at a minimum, Defendant was orally informed of his *Miranda* rights. As such, the issue is not whether Defendant was informed of his rights, but whether his waiver was voluntary, knowing and intelligent.

### B. **Defendant's statement was voluntary.**

Defendant's post-arrest statement is subject to suppression if he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights. *See United States v. Bautista-Avila*, 6 F.3d 1360, 1364 (9th Cir. 1993). The inquiry into the voluntariness of a confession is the same as the inquiry into the voluntariness of a waiver of *Miranda* rights. *See Derrick v. Peterson,* 924 F.2d 813, 820 (9th Cir. 1990). Only voluntary confessions are admissible. *Malloy v. Hogan*, 378 U.S. 1, 7 (1964). *See also* 18 U.S.C. § 3501(a) (West 2000) ("[A] confession . . . shall be admissible in evidence if it is voluntarily given."). The government must prove voluntariness of a confession by a preponderance of the evidence. *United States v. Benitez*, 34 F.3d 1489, 1495 (9th Cir. 1994). The voluntariness of a post-*Miranda* statement is analyzed in light of its independent surrounding circumstances. *See Oregon v.*

*Elstad,* 470 U.S. 298, 318 (1985); *see also United States v. Orso,* 266 F.3d 1030, 1036 (9th Cir. 2001) (en banc) (discussing *Elstad*'s holding), *cert. denied*, 537 U.S. 828 (2002). "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Male Juvenile,* 280 F.3d 1008, 1022 (9th Cir. 2002) (citation and internal quotation marks omitted); *see also Clark v. Murphy,* 331 F.3d 1062, 1072 (9th Cir. 2003).

In this case there was no testimony suggesting that the Government obtained Defendant's statement through any sort of physical of psychological coercion or that his will was otherwise overborne. Defense counsel recognized that this was not an issue in this case. (Tr. 6.) The only determination to be made is whether the waiver was knowing and intelligent.

**C.    Defendant's waiver was knowing and intelligent.**

A waiver of one's *Miranda* rights "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A reviewing court must find that the defendant had a "requisite level of comprehension" from the "totality of the circumstances" in order to properly conclude that his *Miranda* rights have been waived. *Id.* Factors to be considered in evaluating the totality of the circumstances include whether the defendant signed a written waiver, whether he was advised in a language he could understand, whether he appeared to understand his rights, whether his rights were read to him as an individual, and whether he had prior experience with the criminal justice system. *United States v. Garibay*, 143 F.3d 534, 537-39 (9th Cir. 1998).

There is no dispute in this case that Agent Mendez read Defendant his *Miranda* rights. There is also no dispute that the *Miranda* waiver form was given to Defendant prior to questioning. Although Defendant contends he did not respond, he testified that the agents did ask him if he understood what they had said. He then signed the waiver. Despite

8

1  Defendant's contentions that he did not understand the waiver and signed it as directed by
2  the agents, the Court finds it significant that the waiver was in writing and signed by
3  Defendant.  The added formality of signing a document provided by law enforcement
4  officers makes it nearly impossible for Defendant to argue that the warning was not given
5  or that he did not attach significance to the document he was signing.  In *North Carolina v.*
6  *Butler*, 441 U.S. 369 (1979), the Court noted that "[a]n express written or oral statement of
7  waiver of the right to remain silent or of the right to counsel is usually strong proof of the
8  validity of the waiver," even though it is not sufficient to establish waiver by itself.  *Id.* at
9  373.  Considering this factor with others in this case, however, convinces the Court that the
10 waiver was knowing and intelligent.

11      The evidence established that Defendant had sufficient education and intelligence to
12 knowingly and intelligently waive his rights.  Defendant was a civil engineer in Mexico,
13 attended school and admittedly learned to be an independent thinker.  (Tr. at 63-64.)
14 Although it is unclear what qualifications he needed to become a civil engineer in Mexico,
15 there is no indication that the skills required do not suffice to understand the basic meaning
16 of *Miranda* rights.  Agent Mendez conducted the interrogation in Spanish, read Defendant
17 his rights in Spanish and the written waiver form was in Spanish as well.  The record is silent
18 on whether Defendant had previous experience with our justice system.  Overall, these
19 characteristics indicate that Defendant waived his rights knowingly and intelligently.

20      Additional evidence indicating Defendant understood he had the right not to speak
21 comes from Agent Mendez's testimony.  Agent Mendez, who had significant experience
22 conducting interrogations, testified without contradiction that he conducted the interrogation
23 in Spanish, read Defendant his *Miranda* rights from the Spanish waiver form, asked
24 Defendant to read the written waiver form, and asked him if he understood those rights.
25 According to Agent Mendez, Defendant appeared to read his rights, did not ask any questions
26 or look up as he might if he was confused (Tr. at 20), and answered with a verbal "yes"
27 indicating he understood his rights, (Tr. at 23).  Agent Mendez also testified that he saw no
28

indication (verbal comment or body language) that Defendant did not understand what he was doing. (Tr. at 25.)

With the exception of whether Defendant had experience with the criminal justice system, an issue on which no evidence was submitted, the considerations outlined in *Garibay* are satisfied in this case. The Defendant signed a written waiver, was advised of his rights in Spanish, he appeared to understand his rights, and his rights were read to him individually. The Court finds the Defendant's contention that he did not understand his rights and told the agents so, particularly given Defendant's education and the fact he was presented a written waiver, is not credible given the *Garibay* standards. Additionally, the Court finds that Agent Mendez's testimony on these points was credible. The Court therefore finds that Defendant's waiver was knowing and intelligent.

Although it certainly detracts from the Government's argument, the fact that there were spelling errors on the waiver form does not change the outcome. The Supreme Court refused to adopt a "flat rule requiring that the content of *Miranda* warnings be a virtual incantation of the precise language contained in the *Miranda* opinion." *California v. Prysock*, 453 U.S. 355, 355 (1981). Because Defendant chose not to read the waiver form and the most relevant misspelled word ("waiver") had no alternative meaning in Spanish, Defendant was likely not confused by these errors. And since Agent Mendez read the form to Defendant in Spanish anyway, Defendant would not have noticed the errors. Outside of the spelling errors, there were no substantive errors. Although the translator indicated that the final sentence was almost incomprehensible (Tr. at 72), that sentence did not relate to the waiving of *Miranda* rights. For these reasons, and particularly because Defendant indicates he did not read the form, the Court finds the errors in form inconsequential.[3]

---

[3] The Government should be aware, however, that had the Defendant testified that the form was confusing, the outcome might very well be different.

10

Under the circumstances presented in this case, the Government has fulfilled its burden to prove Defendant's statement was voluntary by a preponderance of the evidence under the totality of the circumstances.

### D. The Court will not exercise supervisory power to suppress the statement.

Defendant asserts that the DEA's policy of not recording statements is unjustifiable and "results in a significant diminution of the reliability of evidence of any post-arrest statement." *Motion*, p. 6. The court agrees with defense counsel that "simply recording the conversation that occurred that day was the best evidence that there could be." (Tr. 111.) However, the Ninth Circuit has spoken on this issue and has not adopted such a bright-line rule. In *United States v. Coades*, 549 F.2d 1303 (1977), the defendant/appellant argued that the testimony of an FBI agent that appellant had confessed should have been suppressed because the interrogation was not recorded. *Id.* at 1305. The Ninth Circuit rejected this argument stating that it was up to Congress to enact such a rule. *Id.* Defendant suggests that the Ninth Circuit would no longer follow *Coades* and this Court is therefore not bound by the decision. However, "[o]nce a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court." *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001). The Court finds that *Coades* has not been overruled and it still controls the outcome in the instant matter.

Defendant contends that the holding in *Coades* was undermined by the Supreme Court's decision in *Dickerson v. United States*, 530 U.S. 428 (2000), where the Court acknowledged the appropriateness of judicially determined rules and remedies (like those Defendant seeks to invoke here) to protect Constitutional rights. *Id.* at 439-40. As the Government points out, this argument was rejected by the Ninth Circuit in *United States v. Smith-Baltiher*, 424 F.3d 913 (9th Cir. 2005). In that case, the defendant argued that his post-arrest statements should be suppressed because agents "'unreasonably' neglected to electronically record the interrogation, despite the fact that equipment to do so was readily available." *Id.* at 925. Relying on *Coades*, the Ninth Circuit rejected the argument and in

a footnote rejected the argument that *Coades* had been overruled and stated that "we are not persuaded that *Dickerson* permits us, as a panel, to treat *Coades* as no longer binding. *Id.* at 925 n. 10. *See also Reinert v. Larkins*, 379 F.3d 76, 94 n. 4 (3rd Cir. 2004) (declining to infer a federal right to have custodial interrogations recorded). Certainly, if a Ninth Circuit panel is not permitted to treat *Coades* as non-binding, neither is this Court.

This is not to say, however, that the Court cannot consider the lack of a recorded statement in its examination of the totality of the circumstances. As defense counsel puts it, "when weighing the resources available to the Government, it is somewhat suspicious" that statements are not recorded. (Tr.115:18-20.) The Court will, and in fact has, considered this factor in reaching its conclusion in the instant matter. The outcome was not favorable to the defendant in this case, but given circumstances slightly more favorable to a defendant than those present in the instant case, the outcome may very well be affected by the lack of a recording.

## III.  RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE

Based on the foregoing, the Magistrate Judge recommends that the District Court, after an independent review of the record, **DENY** Defendant Defendant's Motion to Suppress Post-Arrest Statement. (Docket No. 19).

The Magistrate Judge further recommends that the District Court, after an independent review of the record, **DENY IN PART** the Government's Motion to Summarily Dismiss or in the Alternative, Opposition to Defendant's Motion to Suppress Post-Miranda Statements (Docket No. 20) insofar as it seeks the summary dismissal of Defendant's Motion to Suppress.

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See*

1  28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure.
2  Thereafter, the parties have ten (10) days within which to file a response to the objections.
3  If any objections are filed, this action should be designated case number: **CR 07-1172-TUC-**
4  **RCC**.  Failure to timely file objections to any factual or legal determination of the Magistrate
5  Judge may be considered a waiver of a party's right to *de novo* consideration of the issues.
6  *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED this 6th day of October, 2007.

_____
Jacqueline Marshall
United States Magistrate Judge